IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TYSHANIQUE HAMILTON | : | CIVIL ACTION |
| | : | NO. 12-804 |
| v. | : | |
| | : | |
| SOUTHEASTERN PENNSYLVANIA | : | |
| TRANSPORTATION AUTHORITY | : | |

O'NEILL, J.                                                                    June 24, 2014

## MEMORANDUM

Before me is a motion for summary judgment filed by defendant Southeastern

Pennsylvania Transportation Authority, plaintiff Tyshanique Hamilton's response thereto and

defendant's reply.  Plaintiff asserts claims of sex discrimination, harassment and retaliation in

violation of Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act

against SEPTA, her former employer.  For the following reasons, I will grant defendant's

motion.

## BACKGROUND

### I.        2009 Martinez Rumors

Plaintiff commenced her employment with SEPTA as a Maintenance Custodian in

September 2005.  Dkt. No. 21-2 (Ex. A) at 24:8-12; Dkt. No. 21-24 (Ex. W) at ECF p. 13.

Plaintiff applied for and was promoted to the position of Station Manager in June 2009.  Dkt. No.

21-2 at 31:23-32:18.  Plaintiff testified that approximately one or two months before she was

offered the promotion, Lisa Summers, another maintenance custodian and co-worker, accused

her of having sexual relations with SEPTA Assistant Director Rodney Martinez in order to

receive the promotion that Summers knew to be forthcoming to plaintiff.  Dkt. No. 21-2 at 65:2-

21.  Plaintiff testified that three or four co-worker maintenance custodians at the Frankford

Transportation Center made suggestive comments to her that they knew "how" she received her promotion.[1]  Id. at 69:18-70:8.  Plaintiff reported the rumors to her supervisor, John Wojciechowski, who told plaintiff to discuss the rumors with Martinez.  Id. at 70:14-71:1.  When plaintiff discussed the rumors with Martinez, he told her to report the rumors to SEPTA's EEO office.[2]  See id.  Plaintiff reported the rumors to SEPTA's Manager of Employee Relations Thomas Comber.  Id. at 71:15-23.  The next month, plaintiff was notified that she was selected for the position of station manager.  Id. at 71:24-72:2.  Plaintiff does not know if Comber "did anything" regarding her complaint and never spoke to him again.  Id. at 72:13-21.  Plaintiff testified that the rumors about her alleged sexual relationship with Martinez did not persist long because she "was not there that long after that."  Id. at 70:9-13.  Plaintiff testified that "once [she] moved over to [her new position as] station manager the new rumors began, so [she] [did not] know if there was ever a resolution [to the rumors involving Martinez]."  Id. at 72:6-11; 72:22-73:6.

## II.  2009-2010 Supplee Rumors

Plaintiff started reporting to SEPTA Assistant Director of Station Operations Derrick Supplee within six weeks of her promotion to the position of Station Manager.  Id. at 38:17-23.  Plaintiff testified that "a month or two" after working with Supplee, other station managers and maintenance custodians who she supervised began to disseminate rumors that she was involved in a sexual relationship with Supplee.  Id. at 59:3-11.  Plaintiff first heard of the rumors when

---

[1]     Plaintiff testified that "[t]he people at the [Franklin Transportation Center], they were standoffish at that point.  They would say it's not cool how you got the job," Dkt. No. 21-2 at 68:9-13, and "[t]hey would make suggestions like I heard that's how you got the job or I heard this, I heard that."  Id. at 69:6-9.

[2]     Equal Employment Opportunity/Affirmative Action & Employee Relations Department.  See Dkt. No. 21-3 at ECF p. 5.

SEPTA Station Managers Clyde Kirby and Lawrence Pugh[3] made comments to her that Supplee was "her man." Id. at 81:20-24. She attempted to resolve the rumors by explaining to Kirby and Pugh that Supplee "wasn't her man." Id. at 64:5-9. Later, plaintiff testified that "it was workers, it was [other station manager] supervisors just going around joking" with her about her alleged relationship with Supplee. Id. at 83:1-3. Weeks after she first heard the rumors plaintiff claims she reported them to Lee King.[4] See id. at 62:1-8.

On August 21, 2010, Pugh told plaintiff that "everyone [was] talking" about plaintiff "sleeping" with Supplee. See Dkt. No. 21-4 (Ex. C). Later the same night Pugh told plaintiff, "I hear y'all dipping off for three hours each night and doing whatever and doing it wherever. All I wanna say is damn! I guess you gotta be a grade 40. Well, I'm a Grade 38 1/2." Id. Pugh also reportedly said to plaintiff that he wanted to ask Supplee if Supplee needed "the whole 3 hours [with plaintiff], damn Derrick had to be the one to get the young girl." Id. On August 30, 2010, plaintiff returned to work where she was, in an open forum, asked by several hourly employees where she had been the night before since Supplee had been at the office. Id. Plaintiff called Supplee later that night to report the rumors. Id.; see Dkt. No. 21-2 at 59:23. At Supplee's instruction, on the same evening plaintiff reported the rumors to SEPTA Chief District Officer Henry Davis, Jr. Dkt. No. 21-2 at 92:23-94:23. Davis informed plaintiff that such rumors were a violation of SEPTA company policy and that he would address the issue. Dkt. No. 21-26 (Ex. Y) at ¶ 4. Before her shift ended that day, Director of Stations Daryl Wade called plaintiff and instructed her to prepare a report documenting the rumors and also scheduled an appointment for

---

[3]     Pugh was also backfilling as an Assistant Director of Station Operations. Dkt. No. 21-7 at ECF p. 40.

[4]     Plaintiff testified that Lee King was a station supervisor in charge of overnight at the time. Dkt. No. 21-2 at 60:20-22.

her with SEPTA's EEO Office.  Dkt. No. 21-2 at 95:7-16; Dkt. No. 21-5 (Ex. D) at 201:12.  On

September 1, 2010, Wade issued an order via email to SEPTA Assistant Directors Joseph Curtin,

Thomas Dolan, Dennis Murphy, Stacey Richardson, Pugh and Supplee requiring them to post a

notice[5] regarding SEPTA's prohibition of harassment and discrimination in all office zones and

requiring that a copy of which must be given to each manager.[6]  Dkt. No. 21-10 (Ex. I).  Wade's

email warned that "any manager engaging in and/or perpetuating any form of discrimination

and/or harassment in the work place [will] be dealt with severely."  Id.  Wade delivered

plaintiff's report, Dkt. No. 21-4 (Ex. C), to Nancy Berman, a Specialist in SEPTA's Equal

Employment Opportunities & Employee Relations Office on September 2, 2010.  Dkt. No. 21-5

at 23:3-6; 55-13-24; Dkt. No. 21-6 (Ex. E) at ¶ 3.

On September 3, 2010, plaintiff met with Berman and "told her everything," including a

list of the names of people who were allegedly spreading rumors about her.  Dkt. No. 21-2 at

95:17-96:12; Dkt. No. 21-6 at ¶ 4.  Also on the same day, Wade called Station Managers

Lorraine Ayers, Rhonda Patterson, Bottone and plaintiff into his office and read the SEPTA

notice to them.  Dkt. No. 21-7 (Ex. F) at ECF p. 13.  Berman conducted interviews regarding

plaintiff's allegations of sexual harassment with Supplee, Pugh and Station Manager Quintin

Robinson on September 8, 2010; Assistant Director of Station Operations Richard Diamond,

---

[5]      The notice, signed by SEPTA Chief District Officer Henry Davis, Jr., stated that "[a]ny conduct of or condoning of statements that violate the Civil Rights of ANY employee will be justification for disciplinary action up to and including discharge."  Dkt. No. 21-10 (Ex. I).

[6]      Wade's email warned the Assistant Directors that "if [they] know of any acts of misconduct, such as starting or passing rumors and/or innuendos about one's character, or sharing of slanderous remarks of ethnic or sexual in nature, it is also [their] job to stop it immediately and take the proper action."  Wade also required each Assistant Director to respond to his email with a confirmation that his or her zone and managers had received a copy of the SEPTA notice.

Station Manager Jacqueline Hughes and Cashier Jacqueline Fields-Hughes on September 9,

2010; Station Manager Tryone Grier on September 14, 2010; and Kirby, Station Managers

Stephen Ferzetti and Robert Schwering on September 16, 2010.  Dkt. No. 21-7 at ECF pp. 21-54.

Berman's investigation determined that six employees had violated SEPTA's Harassment Policy

by either spreading the rumors or by failing to report the rumors about plaintiff.  Dkt. No. 21-6 at

¶ 9.

On September 15, 2010, plaintiff plaintiff filed an administrative complaint with the

Pennsylvania Commission on Human Relations alleging sexual harassment.  Dkt. No. 21-26 (Ex.

Z) at ECF p. 26.  On September 29, 2010, the U.S. Equal Employment Opportunity Commission

notified plaintiff that her charge filed with the PCHR was forwarded to the EEOC for dual filing.

Dkt. No. 21-28 (Ex. Z) at ECF pp. 70-71.

On November 24, 2010, Berman submitted her Executive Summary of plaintiff's internal

complaint to SEPTA Director of EEO/Affirmative Action & Employee Relations Lorraine

McKenzie.  Dkt. No. 21-7 at ECF pp. 12-19.  Berman's report found:

> --D. Supplee took no action regarding the rumors until he was told
> to prepare a statement;
> --J. Bottone and R. Schwering [were] responsible for sharing the
> rumors with other employees;
> --Although L. Pugh did not admit to all of [plaintiff's] allegations
> against him, his comments to her were inappropriate and violate
> the Sexual Harassment Policy;
> --L. Pugh and T. Grier spoke with D. Supplee about the rumors;
> --J. Bottone spoke with R. Diamond about the rumors, and neither
> took any action as a result of the rumors;
> --There is animus on J. Bottone's part toward D. Supplee and
> [plaintiff];
> --[Plaintiff] made comments that violate the Sexual Harassment
> Policy.

Id. at ECF pp. 15-16.  Berman made the following recommendations with which McKenzie

concurred:

> 1.      Advise T. Hamilton and D. Supplee of the outcome of the
> investigation.
> 2.      Advise management of the outcome of the investigation
> and of the work environment and supervisory issues.
> 3.      Counsel and re-instruct employees as necessary regarding
> SEPTA's Sexual Harassment and Equal Opportunity &
> Affirmative Action Policies.
> 4.      Provide follow-up EEO monitoring of the work
> environment.

Id. at ECF p. 16.

On December 16, 2010, Station Manager Tyrone Grier received a 3-day suspension for

his violations of SEPTA's Sexual Harassment Policy and was notified that he would be subject

to immediate discharge should he engage in any other acts that violate the policy.  See Dkt. No.

21-6 (Ex. E) at ¶ 12; Dkt. No. 21-5 (Ex. D) at 37:10-22; Dkt. No. 21-8 (Ex. G).

On December 20, 2010, plaintiff telephoned Wade to report an incident in the morning at

Olney Avenue Station where plaintiff said that she was finally able to remove some paint that

had spilled on the platform because she "was able to use [her] skills to get it done" and Pugh

allegedly told her in response that her "skills" were what landed him in trouble and the reason

why he had to go down to the EEO.  See Dkt. No. 21-7 at ECF p. 8.  Plaintiff alleged that her

conversation with Pugh took place in the presence of another SEPTA Station Manager,

Jacqueline Ritchie.  See id.  Wade instructed plaintiff to submit a report to him detailing the

incident.  See id.  On December 21, 2010, after receiving a report from Wade regarding the

alleged incident, Berman conducted interviews with Pugh and Ritchie, respectively, pursuant to

SEPTA's EEO/Affirmative Action & Employee Relations Department's investigation of

plaintiff's complaint.  See Dkt. No. 21-7 at ECF pp. 9-11.  Ritchie denied having any knowledge

that plaintiff had filed any complaints since September 10, 2010, denied her presence at the

alleged December 20 conversation between plaintiff and Pugh and denied having spoken to Pugh about plaintiff.  Id. at ECF p. 8. Pugh denied having responded to plaintiff's statement of how she removed the paint.  See id. at ECF p. 11.

Also on December 21, 2010, Pugh and Bottone, respectively, received 5-day suspensions for their violations of the SEPTA Sexual Harassment Policy and were notified that they would be subject to immediate discharge should they engage in any other acts that violate the Policy.[7] See Dkt. No. 21-6 at ¶ 13; Dkt. No. 21-5 at 37:10-22; Dkt. No. 21-8.  On December 27, 2010, Supplee and Diamond, respectively, received Written Warnings for their failure as managers to oversee and uphold SEPTA Sexual Harassment Policy #12.3 and also were notified that they would be subject to immediate discharge should they engage in any other acts that violate the Policy.  See Dkt. No. 21-6 at ¶¶ 14, 16; Dkt. No. 21-5 at 37:10-22; Dkt. No. 21-8.  On December 29, 2010, Davis upheld and denied Supplee's appeal of his Written Warning.  Dkt. No. 21-8.  On January 3, 2011, Davis upheld and denied Diamond's appeal of his Written Warning.  Id.  On January 13, 2011, Diamond, Supplee and Curtin were assigned new schedules and relocated as a result of the merger of SEPTA's maintenance and cashier sections.  Dkt. No. 21-11 (Ex. J); Dkt. No. 21-5 at 41:4-42:18, 46:16-47:3.

On February 3, 2011, plaintiff, Berman and Wade met in order to discuss Berman's investigations, findings and actions taken regarding the rumors against plaintiff.  See Dkt. No. 21-7 at ECF p. 5.  Plaintiff made no further complaints of discrimination, retaliation, and/or sexual harassment at that meeting.  See Dkt. No. 21-2 at 102:20-24; Dkt. No. 21-6 at ¶ 20. Plaintiff has testified that the rumors regarding her and Supplee continued until September 15,

---

[7]     Pugh's Union grievance of his five-day suspension was heard on January 5, 2011 and January 20, 2011 but was dismissed and his suspension upheld.  Dkt. No. 21-8 at ECF pp. 29-33.

2011 when she was terminated, Dkt. No. 21-2 at 84:16-21, and that altogether, approximately 30 people made comments to her about her alleged sexual relationship with Supplee.  Id. at 84:1-15.

### III.    2011 Discharge from SEPTA

In May 2011 plaintiff began reporting to James Simms after his promotion to the position of Assistant Director of Station Operations.[8]  Dkt. No. 21-12 (Ex. K) at 7:21-24, 13:23-14:2.  At the time that Simms was promoted to his new position, he did not know of plaintiff nor had he heard of any rumors about her.  Id. at 19:10-16; 22:3-13.

#### A.    Simms' Directive

On June 1, 2011, Simms emailed station managers, including plaintiff, a directive that they were expected to comply with SEPTA's uniform policy requiring "proper gray pants/slacks, proper white or blue shirts with collars and proper footwear" for ladies when reporting for duty. Dkt. No. 21-14 (Ex. M).  Not long after his directive was issued, SEPTA employee Union representatives approached Simms with complaints that plaintiff was displaying favoritism by removing certain maintenance custodians, most often Leroy Womack and Kyle Simmons, from their work locations and having them drive around all night in SEPTA vehicles while leaving other custodians to perform the remaining work.  See id. at 29:1-20; Dkt. No. 21-13 at ¶ 13. Simms conducted interviews with the complainants and notified his supervisor Wade that he was "looking into [the] complaints."  Dkt. No. 21-12 at 31:1-3.

On June 14, 2011, Simms called plaintiff into his office to discuss the allegations of favoritism made against her.  Dkt. No. 21-15 (Ex. N).  Simms requested that plaintiff submit a

---

[8]     Between January and May 2011, as a result of SEPTA's merger of the maintenance and cashier departments, plaintiff reported to Diamond who was her supervisor. Dkt. No. 21-2 at 103:10-104:11; see Dkt. No. 21-5 at 46:3-47:14 (explaining that Diamond was moved in order to give him "the opportunity to learn and also work in the capacity of [SEPTA] cleaning operation at the time" after the merger).

report to him regarding her reasons "for pulling Womack from his assigned location and why he was riding around with her in a [SEPTA] work truck" on the night of June 10, 2011.  Id. Plaintiff submitted her report to Simms that night.[9]  Dkt. No. 22-4 at ECF pp. 15-16.  On the same night after receiving her report, Simms warned plaintiff not to remove Womack from his assigned location or have him ride in the SEPTA vehicle with her; Simms instructed plaintiff that she could use another maintenance custodian to assist her in delivering supplies and that she could call the train dispatcher and SEPTA police if she had any safety issues.  Dkt. No. 21-13 at ¶ 15.

**B.   OIG Investigation**

On July 12, 2011, Kathleen Blankley, a Detective at SEPTA's Office of the Inspector General, received an anonymous phone call complaining about plaintiff's alleged favoritism to Simmons and Womack.  Dkt. No. 21-16 (Ex. O); Dkt. No. 21-9 (Ex. H) at 18:18-19:5.  Blankley testified that she investigates every anonymous phone call that she receives.  See Dkt. No. 21-9 at 58:6-12.  She reviewed a video recording of the evening of July 30, 2011 and observed that plaintiff's attire of white sneakers, jeans, and a blue V-neck T-shirt with no name tag violated SEPTA's uniform policy.  Id. at 85:17-86:17; Dkt. No. 21-16.  Blankley reported plaintiff's uniform policy violation to Simms and testified that she had no intention of pursuing further investigation of plaintiff.  Dkt. No. 21-9 at 97:17-98:10.

However, on August 22, 2011, Blankley received another anonymous tip that plaintiff had pulled Simmons and Womack from their assignment on the night of August 20, 2011.  Dkt. No. 21-9 (Ex. H) at 97:13-99:1; Dkt. No. 21-16.  Blankley reviewed the video recording of that

---

[9]      Plaintiff's report noted that Womack and Simmons were not pulled from their assigned location but had worked overtime that night fixing a water problem before they were returned to their assigned location.  See Dkt. No. 22-4 at ECF pp. 15-16.

night which showed plaintiff driving a SEPTA vehicle with four male passengers, maintenance custodians Womack, Simmons, Hykim Grant and Karl Walker, while pulling into SEPTA South Terminal at 5:10 a.m.  Dkt. No. 21-16.  Blankley observed that all but Simmons exited the vehicle and plaintiff ran the SEPTA vehicle over Womack's foot.[10]  Dkt. No. 21-16 at ECF p. 4. Upper Darby Police Officer John Millison, SEPTA Police Officer Floyd Whittaker and an ambulance with two medics responded to the incident.  Id.  Police Officer Millison corroborated Blankley's observation in his Police Incident Report:  "While on traffic detail I was alerted of the injured person.  Male had his foot ran over [sic] by a SEPTA truck."[11]  Dkt. No. 21-16 at ECF p. 11.  Blankley interviewed plaintiff, Womack and Simmons about the incident and noted in her investigative report that all three interviews were "inconsistent."  Id.  Blankley recommended that plaintiff's case be sent to plaintiff's supervisor "for whatever action he may deem necessary."  Id.

---

[10]     In her report, Blankley stated:  "In the video Womack appears to walk away, but then went over to the passenger window . . . . I observe Womack walking in a fast pace from the passenger window to the front of the vehicle going over to the driver side.  [Plaintiff driver] shuts the door and accelerates on the gas. The vehicle lunges forward enough for the back tires to run Womack's right foot over."  Dkt. No. 21-16 at ECF p. 4.

[11]     In her report of her phone interview with Millison on August 29, 2011 Blankley noted that "[Officer Millison] observed the truck driving away and he heard the male screaming that his foot was ran over [sic].  He observed the male fall to the ground.  [Millison] . . . called for an ambulance and went over to check on the male."  Dkt. No. 21-16 at ECF p. 40.  Millison stated that he asked the male whether he was okay, but instead plaintiff answered:  "he is okay, he is just playing, I told him he needs to stop playing like that."  Id.  Millison responded that the injured male was hurt after plaintiff had run him over, but plaintiff denied Womack's injury and said "just ask him, he will tell you he was just playing."  Id.  Millison stated that he knew Womack was injured but did not know why they (plaintiff and Womack) were trying to deny that the incident happened.  Id.

## C.     Termination

On September 15, 2011,[12] plaintiff was discharged after Simms determined that plaintiff had violated SEPTA policy #P02 (Use of Non-Revenue Vehicles Policy) and "Use of Authority Vehicle Procedure" requiring a log entry after each use of a SEPTA vehicle, she had failed to immediately contact her supervisor and also failed to complete or submit a report after the accident.[13]  Dkt. No. 21-20 (Ex. S); Dkt. No. 21-12 (Ex. S) at 110:10-112:12; Dkt. No. 21-13 (Ex. L) at ¶ 17.

Plaintiff appealed her termination through the SEPTA Supervisory, Administrative Manual Discipline and Appeal Policy (SAM), but her discharge was upheld by Director of Stations Darryl Wade following an October 12, 2011 determination hearing mandated by the SAM Discipline and Appeals procedure.  Dkt. No. 21-25 (Ex. X).  On November 16, 2011, the Unemployment Compensation Board of Review denied plaintiff's unemployment compensation

---

[12]     Plaintiff's last day of work was September 13, 2011.  Dkt. No. 21-20 (Ex. S).  She asserts that she received her termination notice from Simms on September 14, 2011.  Id.  The termination notice is dated September 15, 2011.  Id.

[13]     Plaintiff was discharged specifically for her violations of SEPTA SAM Discipline and Appeal Policy #E21: IV.B.1 ("Failure to perform any and/or all aspects of an employee's job duties); IV.B. 3 ("Violation of any applicable SEPTA policy, rulebook and/or rule (specifically) IV. B.18 ("Gross negligence, whether a single act or a pattern of conduct or a pattern of negligence in the performance of job duties); IV.B.19 ("Willful misconduct or wanton conduct demonstrating a disregard for the proper performance of job duties"); IV.B.21 ("Insubordination or refusing or willfully failing to follow a management Directive"); IV.B.24 ("Ordering or instructing an employee of SEPTA, or of a contract of SEPTA, to perform activities that are not to the benefit of SEPTA").  Dkt. No. 21-20 (Ex. S).  Plaintiff was also discharged for her violation of SEPTA Policy #P02 "Use of Non-Revenue Vehicles Policy" and "Use of Authority Vehicles Procedure."  Id.

claim after a hearing in which plaintiff and her counsel presented testimony and evidence.[14]  Dkt. No. 21-23 (Ex. V).  Plaintiff subsequently received an EEOC right-to-sue letter dated November 16, 2011.  Dkt. No. 1-1 (Ex. A) at ECF p. 2.  On December 6, 2011, plaintiff, by and through her counsel, indicated her intent to withdraw her appeal of the SEPTA termination decision, citing an alleged lack of effective SEPTA remedies for correcting the hostile work environment and sexual harassment.  Dkt. No. 23-3 (Ex. 2).

Both Womack and Simmons were also discharged[15] but were reinstated to their SEPTA positions on January 20, 2012, after their terminations were overturned through Union-SEPTA grievance proceedings pursuant to the Collective Bargaining Agreement between the two entities.  Dkt. No. 22-4 (Ex. H) at ECF pp. 45-48; Dkt. No 21-5 at 72:22-76:18; Dkt. No. 21-17 (Ex. P) at 55:6-9, 58:19-59:1, 74:4-6; Dkt. No. 21-18 (Ex. Q) at 72:16-20.

## STANDARD OF REVIEW

Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, as to which that

---

[14]   The Referee found that SEPTA:

> had a legitimate business reason for mandating [plaintiff] to cease giving rides to specific people.  Subsequent to receiving the instruction, one of the employer witnesses observed [plaintiff] transporting one of the enumerated co-workers by SEPTA vehicle. The referee interprets this as insubordination which the employer established as a terminable offense as per the employer's written policies.

Dkt. No. 21-23 (Ex. V).

[15]   Womack was discharged for his violation of SEPTA Authority Standard Rules ASR-4-A, ASR 9(A)(16)(e), ASR-9(19), ASR-12(C)(9) and ASR 5(B).  Dkt. No. 22-4 (Ex. F) at ECF p. 36.  Simmons was discharged for his violation of SEPTA Rules ASR 9(A)(16)(e), ASR-9(19) and ASR-12(C)(9) and paragraph E of "Use of Authority Vehicles."  Id. (Ex. G) at ECF p. 41.

party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23. If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. A fact is "material" if it might affect the outcome of the case under governing law. Id.

> To establish "that a fact cannot be or is genuinely disputed," a party must:
>
> > (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989). The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the movant. Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

**DISCUSSION**

## I.      Counts I & II:  Sex Discrimination

SEPTA argues that plaintiff's claims fail under Title VII of the Civil Rights Act of 1964 as amended, 42. U.S.C. § 2000e-2(a) and the related provisions of the Pennsylvania Human Relations Act § 951, et seq.[16] because she cannot establish a prima facie case of sex discrimination.  I agree and will grant summary judgment in favor of SEPTA on Counts I and II of plaintiff's complaint.

### A.      Prima Facie Case

In order to make out a prima facie showing of gender discrimination under Title VII, plaintiff must establish that:  (1) she belongs to a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action despite being qualified; and (4) under circumstances that could give rise to an inference of intentional discrimination.  Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013) (citation omitted); Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008).  In order to establish the last element plaintiff may either:  (1) introduce evidence that similarly situated comparators were treated more favorably under similar circumstances; or (2) rely on circumstantial evidence showing a causal nexus between her membership in a protected class and the adverse employment action.  Greene v. V.I. Water & Power Auth., No. 13-2499, 2014 WL 523363, at *4 (3d Cir. Feb. 11, 2014).  "If a plaintiff fails to raise a genuine dispute of material fact as to any of the elements of the prima facie case, she has not met her initial burden, and summary judgment is properly granted for the defendant."  Id.

---

[16]      The Pennsylvania Human Rights Act "is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently."  Slagle v. Cnty. of Clarion, 435 F.3d 262, 265 n.5 (3d Cir. 2006), quoting Fasold v. Justice, 409 F.3d 178, 195 n.8 (3d Cir. 2005).  There is no difference requiring a different treatment for the claims plaintiff asserts and accordingly, my analysis of plaintiff's Title VII claims applies to her PHRA claims in Counts II, IV, and VI of her complaint.

at 426.  Here, SEPTA argues that plaintiff fails to establish the last element of her prima facie case.  <u>See</u> Dkt. No. 21 at ECF p.12.  I agree with SEPTA.

### 1.    Similarly Situated Comparators

The last element of the prima facie test focuses on whether the employer treated some people less favorably than others because of their "race, color, religion, sex or national origin." <u>Oliver v. Clinical Practices of Univ. of Pa.</u>, 921 F. Supp. 2d 434, 447 (E.D. Pa. 2013).  Plaintiff argues that she has established a prima facie case of sex discrimination because she was treated less favorably than Womack and Simmons who were reinstated to their positions, and there is no evidence that other male station managers were followed by OIG investigators or were told by Simms not to transport certain maintenance custodians in their vehicles.  Dkt. No. 22-1 at ECF pp. 14-16.

In order "[t]o make a comparison of the plaintiff's treatment to that of an employee outside the plaintiff's protected class for purposes of a Title VII claim, the plaintiff must show that he and the employee are similarly situated in all relevant respects."  <u>Houston v. Easton Area Sch. Dist.</u>, 355 F. App'x 651, 654 (3d Cir. 2009).  In evaluating whether employees are directly comparable, relevant factors include:  the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in."  <u>Wilcher v. Postmaster Gen.</u>, 441 F. App'x 879, 882 (3d Cir. 2011).  Employees are considered to be similarly situated when they engage "in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  <u>Houston</u>, 355 F. App'x at 654, <u>quoting</u> <u>Radue v. Kimberly-Clark Corp.</u>, 219 F.3d 612, 617-18 (7th Cir. 2000).  When considering the offenses, "purported comparators must have committed offenses of 'comparable seriousness.'"  <u>Opsatnik v. Norfolk S. Corp.</u>, 335 F. App'x 220, 223 (3d Cir. 2009), <u>quoting</u>

Wright v. Murray Guard, Inc., 455 F.3d 702, 710 (6th Cir. 2006).  "It is the plaintiff's burden to put forth evidence that potential comparators are indeed similarly situated, and the plaintiff's own unsupported statements regarding the comparators' circumstances will not suffice."  George v. Lehigh Valley Health Network (Muhlenberg Hosp.), No. 12-2239, 2014 WL 1464327, at *4 (E.D. Pa. Apr. 15, 2014).

While plaintiff concedes that "Womack and Simmons are not proper comparators to [p]laintiff when evaluating the terms and conditions of employment of all three individuals," Dkt. No. 22-1 at ECF p. 15, she argues that "they are proper comparators . . . because all three (Womack, Simmons, and plaintiff) were terminated by the same supervisor, subjected to the same standards/policies for termination, terminated for the same incident and terminated under very similar circumstances."  Id.  I disagree and find that plaintiff differed from Womack and Simmons in several critical respects.  First, she was their supervisor at the time of discharge; Womack and Simmons were plaintiff's subordinate maintenance custodians and held different responsibilities from plaintiff who was a Station Manager.  Employees who hold different positions and responsibilities from each other are not proper comparators.  See Wilcher, 441 F. App'x at 882 (finding that employees did not qualify as the plaintiff's similarly situated comparators where the plaintiff was their acting supervisor at the time of the alleged misconduct and did not have the same responsibilities).

Second, contrary to her assertion, plaintiff was discharged for different reasons from those for which Womack and Simmons were discharged:  she was discharged because she violated SEPTA's vehicle use policies on August 19-20, 2011 by failing to complete the vehicle log book, and by failing to contact her supervisor or complete and submit an accident report after Upper Darby police, SEPTA police and an ambulance responded when plaintiff drove a SEPTA

vehicle over Womack's foot.  Dkt. No. 21-20 (Ex. S).  Plaintiff was also discharged because she

violated SEPTA's uniform policy on July 30, 2011 and Simms' June 11, 2011 directive to refrain

from pulling either Womack or Simmons from their assigned locations and to cease having them

ride along with her in a SEPTA vehicle.  Id.  It therefore cannot be said that plaintiff was

discharged for the same misconduct as Womack or Simmons.

Finally, both Womack and Simmons were reinstated to their SEPTA positions following

a Union-SEPTA CBA grievance process for which plaintiff asserts she was ineligible.[17]

Plaintiff, on the other hand, appealed her termination through SEPTA's SAM Discipline Appeal

Policy procedure that afforded her a determination hearing during which her termination was

upheld.  Dkt. No. 21-24 (Ex. W).  Womack and Simmons cannot be proper comparators where

they were reinstated following a different grievance process.  See Fields v. SEPTA, 445 F.

App'x 496, 497 (3d Cir. 2011) (affirming a district court's decision finding that the plaintiff, a

non-Union probationary employee, was not similarly situated to another employee who was a

Union member and who was reinstated to his SEPTA position after filing a grievance through his

Union).[18]  I therefore find that Womack or Simmons, who were subordinate to plaintiff, held

different responsibilities, were discharged for different reasons and were reinstated following a

different appeals process, are not plaintiff's proper comparators.

---

[17]     Plaintiff asserts that she was a member of Transport Workers Union Local 234
only in the period between 2005 and 2009 and was therefore ineligible to participate in the Union
grievance process at the time of her 2011 termination.  See Dkt. No. 21-2 at 24:8-15; 158:10-14
(Ex. A).

[18]     Defendant also argues that Womack and Simmons are not proper comparators
because they were Union members while plaintiff was not.  The Court of Appeals has not
addressed this precise issue although the Eleventh Circuit has agreed with defendant's position.
Saidu-Kamara v. Parkway Corp., 155 F. Supp. 2d 436, 441 (E.D. Pa. 2001) (stating same).  I
need not arrive at this issue because I otherwise find that plaintiff fails to make out a prima facie
case of sex discrimination.

Plaintiff next argues that she was treated differently by her supervisor Simms from her male counterparts who are other SEPTA Station Managers.  Dkt. No. 21-22 at ECF pp. 14-16. Specifically, she argues that:  (1) "[t]here is no evidence that the male station managers were followed by OIG investigators"; and (2) Simms made no request of male Station Managers to refrain from transporting certain maintenance custodians in their SEPTA vehicles.[19]  Id. Plaintiff, however, fails to offer relevant evidence that other male station managers were similarly situated to her, specifically, that OIG had received complaints regarding their misconduct but failed to investigate them, or that there was potential misconduct on their part which should have prompted OIG investigators to follow them and they were not followed, or that other male station managers transported certain SEPTA employees in their SEPTA vehicles but were not thereafter directed by Simms to refrain from further similar conduct despite Simms' having received complaints about their conduct.   "[A]bsent evidence that other employees engaged in similar conduct without facing similar consequences, the circumstances surrounding [the plaintiff's] termination [would] not support an inference of discrimination."  Deans v. Kennedy House, Inc., No. 11-7125, 2014 WL 715583, at *12 (E.D. Pa. Feb. 25, 2014).  Without evidence that male station managers were not punished for conduct similar to plaintiff's, I find that they also cannot be her proper comparators.

### 2.    Circumstantial Evidence

Plaintiff also appears to argue that she has established the last element of her prima facie case of discrimination because circumstantial evidence shows that her employment was terminated under circumstances that give rise to an inference of discrimination.  Specifically, plaintiff argues that discipline was recommended against her for an unclean station "within

---

[19]     Plaintiff alleges that other station managers routinely had SEPTA employees in their trucks with them.  Dkt. No. 21-2 at 128:6-9.

weeks" of her filing her EEO complaint, Diamond became her supervisor less than three weeks

after he was disciplined in connection with her EEO complaint, she was followed by OIG

investigators "within months" of her complaint and terminated "less than four full months after

Simms became her supervisor."  Dkt. No. 22-1 at EFC pp. 12-14.  However, none of this

evidence establishes a causal nexus between plaintiff's termination and her membership in a

protected class "from which a reasonable juror could infer, in light of common experience, that

[SEPTA] acted with discriminatory intent."  Anderson v. Wachovia Mortg. Corp., 621 F.3d 261,

275 (3d Cir. 2010).[20]

   Even were I to find that plaintiff has satisfied her burden of establishing a prima facie

case of sex discrimination, and I find that she has not, her claim would still fail because she is

unable to refute SEPTA's non-discriminatory reason for her discharge.  Although plaintiff's

failure to establish her prima facie case justifies summary judgment in defendant's favor, I will

briefly address the remaining two steps of the McDonnell Douglas test.  See id. at 271 (noting

that if the plaintiff succeeds in making out a prima facie case of discrimination, "the burden of

production shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for

the action.") (internal quotation marks omitted).  Plaintiff, however, has not established that

SEPTA's legitimate nondiscriminatory reason was pretextual.  St. Mary's Honor Ctr. v. Hicks,

---

[20]   In her brief, plaintiff appears to mistakenly apply the third step of the McDonnell
Douglas v. Green, 411 U.S. 792, 802-03 (1973) burden-shifting analysis whereby a plaintiff must
"point to some evidence, direct or circumstantial, from which a factfinder could reasonably
either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious
discriminatory reason was more likely than not a motivating or determinative cause of the
employers action" for the finding of employer pretext.  See Dkt. No. 22-1 at ECF p. 12.  The
pretext test is not appropriate at the stage of making a prima facie showing.  Instead, as I have
discussed, plaintiff must demonstrate a causal nexus between her membership in a protected
class and the adverse employment action in order to satisfy the last element of a prima facie
showing of employment discrimination.

509 U.S. 502, 507-08 (1993) (explaining that if the defendant offers evidence of a legitimate nondiscriminatory reason for its employment action, plaintiff's prima facie case is rebutted and plaintiff must show by a preponderance of the evidence that the defendant's explanation is a pretext for discrimination).

**B.      SEPTA's Legitimate Nondiscriminatory Reason for Plaintiff's Termination and Her Failure to Demonstrate Pretext**

SEPTA has clearly articulated legitimate and nondiscriminatory reasons for discharging plaintiff.  She was videotaped to have been out of uniform, failed to enter her use of a SEPTA vehicle into a vehicle use log and also failed to contact her supervisor or submit a report after the accident on the night of August 19-20, 2011, in violation of SEPTA policies.  "Pretext is not demonstrated by showing simply that the employer was mistaken.  Instead the record is examined for evidence of inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons."  Sempier v. Johnson & Higgins, 45 F.3d 724, 731 (3d Cir. 1995) (citations omitted); Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 332 (3d Cir. 1995) ("[A]n employer may have any reason or no reason for discharging an employee so long as it is not a discriminatory reason"); Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) ("The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]") (citation omitted).  Here, plaintiff argues that SEPTA's articulated reasons for discharging her are pretextual as evidenced by the following:  Simms had not advised plaintiff that she was out of uniform on July 30, 2011; no accident occurred involving plaintiff and Womack as evidenced by Womack and Simmons' consistent denial that an accident occurred; and Simms only cites one date, June 15, 2011, on which plaintiff pulled Womack from an assigned location and plaintiff had a cogent reason for her actions on that day.  See Dkt. No. 22-1 at ECF pp. 19-22.  Finally, plaintiff contends that she

heard from several people that Simms "wanted McFadden to make statements to OIG that would implicate [p]laintiff in some wrongdoing."[21]  Dkt. No. 22-1 at ECF p. 20; see Dkt. No. 22-4 (Ex. M).

I find plaintiff's arguments to be either clearly contravened by the record evidence or wholly unfounded.  Upper Darby Police Officer Millison and SEPTA Police Officer Whittaker's Incident Reports, Dkt. No. 21-16 at ECF pp. 11, 12, unambiguously show that plaintiff was involved in an accident on the night in question, one that she failed to report in addition to her failure to report her use of a SEPTA vehicle on the same night.[22]  Her violation of SEPTA's uniform policy on July 30, 2011 is recorded on video[23] and the issue of whether or not Simms should have given her prior warning, even assuming arguendo that they had met earlier in the day when she was out of uniform, is irrelevant.  Further, Simms' Notice of Discharge to plaintiff

---

[21]     In her declaration, plaintiff stated: "I later heard from several people that Mr. Simms had offered to dismiss [plaintiff's] 'write-up' [of McFadden for allegedly sleeping while on duty] if McFadden cooperated with him and OIG in their investigation of me."  Dkt. No. 22-4 (Ex. M).

[22]     Plaintiff's attempt to characterize the accident on that night as an "incident" because Womack denies having suffered an injury does not absolve her of her duty to report the event.  See Dkt. No. 22-1 at ECF pp. 17-18.  SEPTA Policy #P02 "Use of Non-Revenue Vehicles Policy" clearly states:

> Any accident or _incident_ involving a SEPTA Vehicle must be reported immediately, and no later than the end of that work shift, to supervision in the employee's division/department and SEPTA's Control Center.  Prior to the end of that shift the employee shall complete a written accident report and submit it to his/her immediate supervisor with a copy sent to the division/department head.

Dkt. No. 21-21 (III. A.) (emphasis added).

[23]     Plaintiff does not dispute the veracity or the contents of the video.

clearly cites July 30, 2011 as a night when plaintiff was videotaped removing Womack and Simmons from their assigned locations in spite of Simms' June directive to refrain from doing so.  Dkt. No. 21-20 at ECF pp. 4-5.  Finally, plaintiff's conclusory contention that Simms offered McFadden an incentive to implicate plaintiff is completely unsupported by the record, including McFadden's testimony, and fails to raise a genuine issue of material fact as to pretext.  See James v. Allentown Bus. Sch., No. 01-857, 2003 WL 21652189, at *12 (E.D. Pa. June 2, 2003) ("Plaintiff's deposition testimony contain[ing] only conclusory allegations and hearsay . . . is insufficient to establish a genuine issue of material fact as to this issue.").

Even were I to assume that that Simms' decision to discharge plaintiff was mistaken, I find that there is no evidence that his decision was pretextual and will grant SEPTA's motion with regards to plaintiff's claims of sex discrimination in Counts I and II of her complaint.

## II.   Counts III & IV: Sexual Harassment Hostile Work Environment[24]

SEPTA argues that plaintiff's sexual harassment hostile work environment claim fails because she has not produced any evidence to suggest that the 2009 (Martinez) rumors were both severe and pervasive, and SEPTA took appropriate remedial action reasonably calculated to stop the 2010 (Supplee) rumors.  See Dkt. No. 21 at ECF pp. 27-31.  I agree.

Plaintiff may demonstrate that Title VII violation by proving that sexual harassment created a hostile or abusive environment in the workplace.  Carter v. W. Chester Univ., No. 11-7187, 2014 WL 1652196, at *3 (E.D. Pa. Apr. 23, 2014), citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993).  In order to succeed on her hostile work environment claim, plaintiff must

---

[24]         In my decision of August 21, 2012, I found that plaintiff's allegations in paragraphs 10 through 17 of her complaint regarding the 2009 rumors were reasonably related to the 2010 sexual harassment charges alleged in her PCHR administrative complaint. Dkt. No. 9. I denied SEPTA's motion to dismiss plaintiff's claims premised on those paragraphs.  Id.

demonstrate that she:  "(1) suffered intentional discrimination because of [her] sex;[25] (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected [her]; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of respondeat superior liability."  Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013).

In order to determine whether conduct is "severe" or "pervasive," I must assess the totality of circumstances to determine "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 205 (3d Cir. 2001), quoting Harris, 510 U.S. at 23.  The conduct must "go beyond 'simple teasing, offhand comments, and [non-serious] isolated incidents,'" which would "'not amount to discriminatory changes in the terms and conditions of employment.'"  Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 280 (3d Cir. 2001), quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1988).  Instead, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris, 510 U.S. at 21 (internal citation and quotation marks omitted).

The last element of the test for a hostile work environment claim establishes the basis on which to hold an employer liable.  Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009).  "Employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint, or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate

---

[25]    The parties do not dispute that plaintiff was subjected to the alleged offensive acts because of her sex, and I therefore accept for purposes of defendant's motion that the harassing acts at issue were due to her sex.

remedial action." Id. (internal citations omitted). "An employer's remedial action is adequate if it is reasonably calculated to prevent further harassment." Id. at 110. "The question whether a chosen remedy was reasonably calculated to prevent further acts of harassment can be answered at the time that remedy is put into place." Knabe v. Boury Corp., 114 F.3d 407, 415 (3d Cir. 1997).[26]

### A.    Martinez Rumors

With respect to the Martinez rumors, plaintiff alleges that her harassers were co-worker maintenance custodians Summers and approximately three or four other people who insinuated that she received her promotion by having sexual relations with Martinez. See Dkt. No. 21-2 at 70:4-8. Plaintiff testified that she reported the rumors to Martinez, who instructed her to report the rumors to SEPTA's EEO office. She did, but concedes that she "can't really remember whatever happened" and "can't really recall what was still going on" in response to the question of whether the rumors stopped after her report. Dkt. No. 21-2 at 72:6-11. She testified that she does not know whether Comber, a Manager of Employee Relations, "did anything" because she never spoke to him again but concedes that the Martinez rumors persisted "not long." Dkt. No. 21-2 at 70:9-13; 72:13-21. There is no evidence in the record to suggest that the Martinez rumors materially interfered with plaintiff's ability to do her work. In fact, during the time that

---

[26]    On the other hand, employer liability for a supervisor's creation of an actionable hostile environment is dependent upon whether the supervisor with immediate or successively higher authority over the employee took "tangible employment action" against the employee. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998). If the supervisor charged with creating the hostile environment did not take tangible employment action against the employee, the employer may assert as an affirmative defense the fact that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior . . . and that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Hitchens v. Montgomery Cnty., 278 F. App'x 233, 236 (3d Cir. 2008), quoting Ellerth, 524 U.S. at 765.

plaintiff alleges that the Martinez rumors were ongoing, plaintiff received a promotion and assumed her new position of Station Manager.

The Martinez rumors therefore cannot be said to have been so severe or pervasive as to have amounted to a discriminatory change in the terms or conditions of plaintiff's employment. See Brooks v. CBS Radio, Inc., 342 F. App'x 771, 776 (3d Cir. 2009) ("it is not sufficient for [plaintiff] to have subjectively perceived the harassment as severe or pervasive; the conduct in question must also be so severe or pervasive that it creates an objectively hostile work environment."); Miller v. Thomas Jefferson Univ. Hosp., No. 12-4432, 2014 WL 1690447, at * 5 (3d Cir. Apr. 30, 2014), citing Faragher, 524 U.S. at 788 ("simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment") (internal quotation marks removed).

Plaintiff is also unable to make out the existence of respondeat superior liability as her own testimony does not show that SEPTA's reporting avenue was unreasonable or that management-level SEPTA employees knew or should have known about the harassment and took no remedial action.  See Andrews v. City of Phila., 895 F.2d 1469, 1486 (3d Cir. 1990) (noting that an employer knows or should have known about workplace sexual harassment when management-level employees have actual or constructive knowledge about the existence of a sexually hostile work environment).

### B.  Supplee Rumors

With respect to the Supplee rumors, the parties do not dispute that plaintiff's harassers were her co-workers.[27]  Plaintiff contends that SEPTA failed to take prompt or reasonable care to

---

[27]     Plaintiff concedes that Richard Diamond, who was her supervisor for a period of several months prior to Simms, and who was disciplined for his failure to report the rumors regarding plaintiff and Supplee, never himself made inappropriate comments to her.  See Dkt.

prevent harassing behavior toward her as demonstrated by the following:  (1) Berman did not issue her Summary Report until November 24, 2010, after plaintiff filed a complaint with the PCHR, and did not recommend any disciplinary action in her report; (2) SEPTA failed take disciplinary action against plaintiff's harassers until December 20, 2010; (3) one of the disciplined individuals, Diamond, became plaintiff's supervisor for several months before Simms' became her supervisor; and (4) rumors continued regarding plaintiff but Simms failed to address plaintiff's concerns or Berman's recommendations.  See Dkt. No. 22-1 at ECF pp. 28-31.

In determining whether an employer's remedial action is adequate, "[t]ypically, the timing and nature of the employer's response will dictate the adequacy of the remedial action." Griffin v. Harrisburg Prop. Servs., Inc., 421 F. App'x 204, 209 (3d Cir. 2011) (finding that the employer took adequate remedial action where it commenced an investigation on the next business day after the plaintiff's complaints, the complaints were investigated and resulted in discipline and a final warning to the harasser); see also Andreoli v. Gates, 482 F.3d 641, 644 (3d Cir. 2007) ("[The Court of Appeals has] found an employer's actions to be adequate, as a matter of law, where management undertook an investigation of the employee's complaint within a day after being notified of the harassment, spoke to the alleged harasser about the allegations and the company's sexual harassment policy, and warned the harasser that the company does not tolerate

_____

No. 21-2 at 120:8-121:19.  Plaintiff does not claim and the record does not indicate that Simms, her supervisor and the sole decision-maker in her discharge, was involved in the sexual harassment rumors against her.  Nor does the record indicate that Pugh was plaintiff's supervisor. See Dkt. No. 21-2 at 124:22-125:8 (testifying in her deposition that she reported only to Diamond, not to anyone else, including Pugh).  Plaintiff thus did not suffer a tangible employment action from a harassing supervisor.  See Vance v. Ball State Univ., 133 S.Ct. 2434, 2443 (2013) (defining a supervisor to be one whom "the employer has empowered . . . to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits' and noting that "colloquial uses of the term 'supervisor' [are] misplaced") (citation omitted).

any sexual comments or actions."); Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d

100, 110 (3d Cir. 2009) (affirming the district court's judgment denying the plaintiff's hostile

environment claim where the employer launched an investigation on the day the plaintiff filed

her complaint, interviewed various individuals the plaintiff mentioned in her complaint and

disciplined every employee it found to have violated company policies).

In the instant case, on the day plaintiff informed Wade of the harassing rumors, he

scheduled an appointment for her with SEPTA's EEO office, issued an email warning to SEPTA

Assistant Directors prohibiting "any form of discrimination and/or harassment in the workplace"

and in no uncertain terms warned that any manager engaging in such would be dealt with

"severely."  The next day, Wade called Station Managers Ayers, Patterson, Bottone and plaintiff

into his office and read to them SEPTA's Notice prohibiting discrimination or harassment that

stated "[a]ny conduct of or condoning of statements that violate the Civil Rights of ANY

employee will be justification for disciplinary action up to and including discharge."  Dkt. No.

21-10 (Ex. I).  Also that day, Berman of SEPTA EEO's office met with plaintiff to discuss the

rumors.  See Dkt. No. 21-6 at ¶ 5.

Berman conducted the first of her interviews of employees identified by plaintiff five

days later, on September 8, 2010.  Id.  Berman submitted her Report regarding her investigation

into plaintiff's allegations on November 24, 2010, and recommended counseling and re-

instructing employees regarding SEPTA's Sexual Harassment and Equal Opportunity &

Affirmative Action Policies and providing follow-up EEO monitoring of the work environment.

In response to another call from plaintiff on December 20, 2010 regarding her additional

allegations of Pugh's harassing conduct, Berman conducted interviews on the same day with the

two individuals plaintiff named, Pugh and Ritchie.  On December 21, 2010, SEPTA disciplined

Pugh and Bottone, and the following week on December 27, 2010, disciplined Schwering,

Supplee and Diamond—the latter two for their failure to oversee and uphold SEPTA's Sexual

Harassment Policy as part of their managerial responsibilities.

SEPTA promptly investigated plaintiff's complaints, took immediate action to notify its

employees of its anti-harassment policy and disciplined every employee found to have harassed

her or to have failed to stop the harassment.  I therefore find that SEPTA's actions were

reasonably calculated to prevent further harassment to plaintiff.  Indeed, plaintiff concedes that

she made no further complaints of sexual harassment after February 3, 2011, when she met

Berman for the last time to discuss Berman's investigation into plaintiff's complaint, Berman's

findings and actions taken.  See Dkt. No. 21-7 at ECF p. 5.

Plaintiff's argument that SEPTA failed to take prompt remedial action is centered upon

her issue with Berman's alleged failure to issue the Summary Report until November 24, 2010,

and SEPTA's failure to discipline relevant employees until December 2010, see Dkt. No. 22 at

ECF pp. 28-30.  However, as I have discussed, SEPTA immediately took steps that were

reasonably calculated to prevent further harassment to plaintiff and therefore are adequate as a

matter of law.  Plaintiff cannot dictate SEPTA's selected remedial action.  See Knabe, 114 F.3d

at 414 ("[I]f the remedy chosen by the employer is adequate, an aggrieved employee cannot

object to that selected action.  Concomitantly, an employee cannot dictate that the employer

select a certain remedial action.").

Plaintiff also contends that SEPTA failed to limit her interaction with the disciplined

employees, including Diamond who became her supervisor.  However, plaintiff concedes that

Diamond never having made a comment to her about her alleged relationship with Supplee or

any other comment that was inappropriate in the workplace.[28]  See Dkt. No. 21-2 at 120:8-

121:19.  Plaintiff does not allege that her continued interaction with other disciplined employees

was detrimental.  Finally, her vague and conclusory contentions that rumors about her continued

despite SEPTA's remedial actions, are insufficient to establish a genuine issue of material fact as

to whether she suffered continued harassment.[29]  See James, 2003 WL 21652189, at *12.

Accordingly, I will grant summary judgment in favor of SEPTA on plaintiff's claims of a hostile

environment in Counts III and IV of her complaint.

## III.    Counts V & VI:  Retaliation

SEPTA argues that plaintiff's retaliation claims fail because she has not produced any

evidence to suggest that Simms, her alleged retaliator, had knowledge of her prior SEPTA EEO

or PCHR complaint.  Dkt. No. 21 at ECF pp. 17-21.  I agree and further find that plaintiff fails to

establish the requisite causal connection between her protected activity and her termination.

### A.    Prima Facie Case

In order to establish a prima facie case of retaliation under Title VII and the analogous

provisions of the PHRA, plaintiff must show that she:  (1) engaged in protected activity, (2) was

subject to adverse action either subsequent to or contemporaneous with the protected activity;

and (3) there was a causal connection between the protected activity and the adverse employment

---

[28]    Plaintiff testified that Diamond routinely challenged her time sheets while he was her supervisor. Dkt. No. 22-4 (Ex. M).  Her conclusory allegations alone, without more as to why Diamond challenged her time sheets or whether there was a basis for his actions, are insufficient to raise a genuine issue of material fact.  See James, 2003 WL 21652189, at *12.

[29]    Plaintiff testified that "[t]here were still rumors" and "[g]oing to a station, you hear them.  You hear people make comments." Dkt. No. 21-2 at 102:20-103:9.  It is further unclear from plaintiff's deposition whether the rumors that plaintiff alleges to have persisted beyond SEPTA's remedial actions were rumors about her alleged relationship with Supplee or about employees having been subjected to discipline because of plaintiff's complaints.  See Dkt. No 21-2 at 102:20-105:19.

action.[30]  Fasold, 409 F.3d at 188.  To prove the requisite causal connection, plaintiff must be

able to show the decision-maker "had knowledge of her protected conduct when [he] decided to

discontinue [his] relationship with her."  Trent v. Test Am., Inc., No. 10-1290, 2013 WL

1809236, at *8 (E.D. Pa. Apr. 30, 2013) aff'd, No. 13-2550, 2014 WL 1015938 (3d Cir. Mar. 18,

2014).  "It is not reasonable for a factfinder to infer that an employer's reaction was motivated by

an intent to retaliate for conduct of which the employer's decision maker was not aware."  Moore

v. City of Phila., 461 F.3d 331, 351 (3d Cir. 2006).  "Essential to establishing a causal link is

evidence that the personnel who subjected [the p]laintiff to the adverse [employment] action[]

were aware of [the p]laintiff's protected activity."  Murphy v. Se. Pa. Transp. Auth., No. 09-

1590, 2010 WL 571799, at *6-7 (E.D. Pa. Feb 12, 2010).

　　　　There is no dispute that plaintiff engaged in protected activity when she filed her

complaints with SEPTA EEO and the PCHR.  Plaintiff contends that Wade, who was aware of

plaintiff's prior EEO and PCHR complaints, was the decision-maker who terminated her, as

evidenced by her October 12, 2011 termination letter bearing his signature.  See Dkt. No. 22-1 at

ECF pp. 22-23.  I find, however, that the evidence does not support plaintiff's contention that

Wade was the decision-maker in her termination despite her efforts to construe him as one.[31]

---

[30]　　　An adverse employment action is one that "alters the employee's compensation,
terms, conditions, or privileges of employment, deprives him or her of employment
opportunities, or adversely affects his or her status as an employee."  Moore v. City of Phila.,
461 F.3d 331, 341 (3d Cir. 2006), citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d
Cir. 1997), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S.
53 (2006).

[31]　　　Even were I to find Wade to be the decision-maker in plaintiff's termination, and
I do not, plaintiff's claim of retaliation based solely upon Wade's knowledge of her protected
activities, see Dkt. No. 22 at ECF pp. 22-23, is insufficient to make out her prima facie case.
Plaintiff must also demonstrate that there was a causal connection between her protected activity
and the adverse employment action, which she fails to do as I discuss below.  See Fasold, 409
F.3d at 188.

Wade testified that he merely "upheld Mr. Simms' discharge decision based on [Simms']
independent conclusion that [plaintiff] was out of uniform on the evenings in question and that
[plaintiff] disobeyed directives by allowing [sic] and Mr. Womack to ride in her SEPTA vehicle
with her, and by failing to report an accident to her immediate supervisor." Dkt. No. 23-4 at
¶ 11. Wade further testified that "Simms alone made the decision to discharge [plaintiff] and did
not obtain approval from me, or from any other SEPTA employee." Id. at ¶ 9. Finally, Wade
testified that, prior to her termination, he never communicated to Simms that plaintiff had made a
complaint of discrimination and sexual harassment to SEPTA's EEO office, or that she filed a
complaint with the PCHR. Id. at  ¶¶ 5,6. Wade's testimony is corroborated by Simms who
testified that he was the sole decision-maker in discharging plaintiff and that he was not, at any
time prior to plaintiff's termination, aware that she had previously filed EEO or PCHR
complaints, or even that there were rumors that she was having sexual relationships with other
employees. Dkt. No. 21-13 at ¶¶ 7-9, 19;  Dkt. No. 21-12 at 22:9-13. Here, plaintiff's assertion
that Wade was the decision-maker in her termination and that Simms was aware of her prior
complaints are conclusory.[32]

        As evidence that she was retaliated against after filing her EEO and PCHR charge,
plaintiff notes that she was disciplined for an unclean station not under her jurisdiction, followed
by OIG detectives, had a GPS device placed on a SEPTA vehicle thought to belong to her,
subjected to "anonymous tips" and given a "directive" by Simms.[33]  Dkt. No. 22-1 at ECF pp.

---

[32]        Plaintiff's argument in support of her allegations consists of her rhetorical
questions:  "Is it really plausible to believe that Simms had no idea of Plaintiff's EEO complaint
or P[HRC] complaint?  He was hired as Plaintiff's supervisor and no one mentioned Plaintiff's
EEO complaint to him at that time?"  Dkt. No. 22-1 at ECF p. 23.  I find plaintiff's argument to
be unpersuasive.

[33]        I am not persuaded by plaintiff's placement of the terms "anonymous tips" and

12-14, 24-25.  Plaintiff appears to suggest that the timing of SEPTA's actions is indicative of a causal connection between her protected activity and her termination.  Plaintiff may show causation by demonstrating:  "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link" or (3) "from the 'evidence gleaned from the record as a whole' the trier of the fact should infer causation."  Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007), quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000).  The Court of Appeals has "declined to establish a bright line rule dictating a specific amount of time [between protected activity and adverse employment action] . . . in order for the court to find an 'unusually suggestive temporal proximity,' or 'pattern of antagonism.'"  Morrin v. Torresdale Frankford Country Club, No. 07-5527, 2008 WL 2389469, at *7 (E.D. Pa. June 11, 2008).  However, it has held that adverse employment action taken approximately one year after an employee engaged in a protected activity is not an unusually suggestive interval.  Griesbaum v. Aventis Pharm., 259 F. App'x 459, 467 (3d Cir. 2007).

The one-year interval between plaintiff's September 15, 2010 complaint to the PCHR, and her September 15, 2011 discharge is not unusually suggestive of retaliatory action.[34]  See Revell v. City of Jersey City, 394 F. App'x 903, 907 (3d Cir. 2010) (finding that alleged retaliatory action over one year after protected activity was insufficient to establish unusually suggestive temporal proximity); C.M. v. Board of Educ. of Union Cnty. Reg'l High Sch. Dist.,

---

"directive" in quotation marks throughout her response to defendant's motion as an apparent suggestion that the telephone calls to Detective Blankley were not anonymous and that Simms' directive was not legitimate.

[34]    The temporal interval is over a year between when plaintiff was discharged and when she first reported the Martinez rumors to SEPTA's EEO in June 2009; and also when she first reported the Supplee rumors to SEPTA's EEO on September 2, 2009.

128 F. App'x 876, 883 (3d Cir. 2005) (finding that a three-month period between protected conduct and alleged retaliatory action was not "unusually suggestive" of improper motive); Conklin v. Warrington Twp., No. 06-2245, 2008 WL 2704629, at *12 (M.D. Pa. July 7, 2008) (finding that a two month period was not so "unduly suggestive as to give rise to an inference of causation"); Fisher v. Transue, No. 04-CV-2756, 2008 WL 3981521, at *10 (M.D. Pa. Aug. 22, 2008) (finding that "the difference in time must be measured in days, rather than in weeks or months, to establish causation on its own," and a "period of twenty-two days is too lengthy to give rise to an inference of causation").

Plaintiff has also not set forth facts to show a causal connection between her protected activity and the adverse actions taken against her through a pattern of antagonism coupled with timing.  Plaintiff claims that discipline was recommended against her for an unclean station within "weeks of her" filing her PCHR complaint, however, no action was actually taken against plaintiff despite the recommendation.[35]  As to plaintiff's allegation that OIG investigators began following her after her EEO and PCHR complaints in September 2010, plaintiff leaps to the conclusion that the events were connected because she claims she saw people follow her whom she thought to be from the OIG.[36]  However, Detective Blankley testified that no OIG investigators followed plaintiff from October 2010 until May 19, 2011, when a GPS tracking

---

[35]     Berman's interview notes with Supplee state:  "Director of Maintenance Anthony Alesandrine directed [Supplee] to call complainant in and write complainant up.  Pictures sent in by [sic] of the station.  [Supplee] called complainant in but did not write her up."  Dkt. No. 21-27 at ECF p. 89.

[36]     Plaintiff asserts that she knew that investigators from the OIG were following her because "[t]here's pictures of them.  You know what they look like, you know who they are," Dkt. No. 21-2 at 115:11-12, and "[y]ou can go on the 7th or 6th floor, like when they're promoting people, they have the picture.  Or when you go in training, they'll tell you need to call IG. There's been, you know, times we've seen a photo of them."  Id. at 115:15-20.

device was placed on plaintiff's SEPTA vehicle in response to allegations that she may have been sleeping on duty.[37]   Dkt. No. 21-9 (Ex. H) at 46:14-47:10.  Finally, the fact that anonymous tips were made in July and August 2011—nearly 10 to 11 months after plaintiff filed her complaints with the EEO and PCHR—to Detective Blankley regarding allegations of plaintiff's favoritism in pulling certain maintenance workers from their shifts, which were subsequently substantiated in the course of Blankley's investigation, are not suggestive of causal retaliatory action despite plaintiff's insinuation that the tips were not anonymous and were meant to be retaliatory.  See supra note 33.

Accordingly, I find that plaintiff fails to make out a prima facie case of retaliation and will grant SEPTA's motion for summary judgment with respect to Counts V and VI of her complaint.

An appropriate Order follows.

---

[37]   Blankley testified that the GPS device was placed "because there was something with her sleeping on duty, but I can't tell you that 100 percent."  Dkt. No. 21-9 at 71:17-22.